1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10

11   DARYL LOWRY;                    )   Civil Nos. 09-CV-882-BTM(WVG)
                                     )              09-CV-898-BTM(WVG)
12              Plaintiff,           )              09-CV-1141-BTM(WVG)
                                     )
13        v.                         )   REPORT AND RECOMMENDATION ON
                                     )   DEFENDANT HERITAGE SECURITY'S
14   HERITAGE SECURITY, *et al.*,    )   MOTION FOR TERMINATING
                                     )   SANCTIONS
15              Defendants.          )
     _____)
16                                   )
            AND RELATED CASES.       )
17   _____)

18        Defendant Heritage Security Services ("Heritage"), moves the

19   Court to impose terminating sanctions against Plaintiff for his

20   obstructive conduct and discovery abuses in the three cases he filed

21   against Heritage and non-moving Defendant, Metropolitan Transit

22   System.  (882 Case:  Doc. No. 88; 898 Case:  Doc. No. 65; 1141 Case:

23   Doc. No. 76.)[1]  Heritage's motion is based on the history of this

24   case, Plaintiff's violation of a court order, and Plaintiff's lie

25   that allowed him to successfully avoid being deposed.   After

26   considering all of the above, and after holding a hearing, the

27

28   _____

     [1] All further references to documents on the Court's docket are to documents in the 09-CV-
     882-BTM(WVG) matter.

                             1            09CV882, 09CV898, 09CV1141

1    undersigned RECOMMENDS that Heritage's motion be GRANTED and that

2    all three cases against Heritage be DISMISSED.

3                            **I.   BACKGROUND**

4    **A.      General Background**

5            Filed in April and May of 2009, Plaintiff's cases follow

6    separate run-ins with security personnel aboard and around the San

7    Diego Trolley.    According to Plaintiff, Heritage's employees

8    violated his civil rights when they unjustly detained, arrested, or

9    searched him without cause.    Plaintiff also alleges the unreasonable

10   use of force to secure his detentions and arrests.    As a result,

11   Plaintiff claims he suffered serious injuries, including a "busted"

12   face, which required medical care.

13           For their part, Defendants claim that security personnel

14   encountered Plaintiff aboard or around the San Diego Trolley after

15   he drew their attention by either exhibiting the signs of being

16   under the influence of alcoholic beverages, refusing to produce

17   proof that he had paid his trolley fare, or by creating disturbances

18   aboard the trolley or on trolley property.    They claim Plaintiff was

19   consistently belligerent, refused to cooperate, escalated his

20   disruptive behavior, resisted arrest, and actively attacked security

21   officers after being contacted.

22           All three cases were transferred to the undersigned's

23   caseload on December 11, 2009.    With all three cases now over two

24   years old, the fact discovery cut-off expired on June 10, 2011,

25   without any request for extension of discovery. (See Doc. No. 69 at

26   2.)

27

28

**B.      Procedural Background**

        **1.    October 18, 2010:  Early Neutral Evaluation Conference**

On October 18, 2010, the undersigned convened an Early Neutral Evaluation Conference.  Fearing for their safety, counsel for Defendants requested that the Court have security present during the ENE.  Plaintiff had apparently left several aggressive voicemail messages for counsel, and they had felt so threatened that they had sought a restraining order against Plaintiff.[2/]  The Court took the extraordinary measure of having two United States Marshals Deputies present for the duration of the ENE.  In person, the undersigned observed that Plaintiff was at times visibly agitated and belliger- ent and expressed at various times that he was "pissed" and proclaimed:  "I ain't afraid of no one.  I won't let anyone touch me," referring to his confrontation with trolley security.  Additionally, Plaintiff directed his aggression towards defense counsel personally, calling them liars.  It was clear to the undersigned that Plaintiff held an intense emotional stake in his cases, had difficulty controlling his emotions, and <u>intensely</u> disliked Defendants and their counsel.  As a result, the undersigned believed Plaintiff would benefit if he retained counsel and strongly encouraged him to consider doing so.  Before concluding the ENE, the undersigned advised Plaintiff to conduct himself civilly and explained that the Court would grant him some leeway, but would not ignore the rules simply because he was proceeding *pro se*.  Plaintiff said he understood.

---

[2/] Although counsel represents that an active TRO against Plaintiff exists, the TRO does not appear under Plaintiff's name in the San Diego County Sheriff's public database.  <u>See</u> https://apps.sdsheriff.net/tro/tro.aspx (last visited July 5, 2011).

09CV882, 09CV898, 09CV1141

1           **2.   December 10, 2010:  Case Management Conference**

2           On December 10, 2010, the undersigned convened a telephonic

3    case management conference and quickly realized that Plaintiff could

4    not control himself over the telephone.   Perhaps because he was

5    outside the presence of the Court, Plaintiff often went on emotion-

6    fueled rants about his injuries and what he perceived as delay

7    tactics by counsel for Defendants.   He routinely interrupted the

8    undersigned, asserted that Defendants were trying to take advantage

9    of him, and asserted that he would not back down.  He also expressed

10   that he was seeking representation.

11          **3.   January 6, 2011:  Status Hearing**

12          On January 6, 2011, the undersigned held a status hearing to

13   allow Plaintiff the opportunity to air his grievances, as he had

14   called the undersigned's chambers three times after the CMC and

15   expressed dissatisfaction with the judicial process and Defendants.

16          On December 28, 2010, Plaintiff called chambers, spoke with

17   the undersigned's law clerk, and stated he was going to "cheat"

18   despite the undersigned telling him he could not do so, was going to

19   appeal Judge Moskowitz's dismissal of his state forgery claim, and

20   proclaimed:  "To hell with what the judge says.  I'm coming after

21   them [Defendants]."

22          On Thursday, December 30, 2010, at 7:15 p.m., Plaintiff left

23   a message on chambers voicemail, stated he may have to leave the

24   state for family reasons, and stated he wanted to meet with the

25   Court on Monday, January 3, 2011, to discuss his cases.  Plaintiff

26   expressed impatience at the pace of the litigation and stated:  "We

27   have to do something.  I'm not going out like a sucker. . . .  When

28   I do come back, I'm gonna hit 'em double."  Friday, December 31,

1    2011, was an observed court holiday and the chambers staff did not

2    return Plaintiff's phone call as a result.

3        On Sunday, January 2, 2011, Plaintiff left a markedly more

4    agitated message on chambers voicemail and expressed his strong

5    displeasure that his first message was not returned.  He stated:

6    "I'm not appreciating everything that's going down and what's going

7    down."  He demanded to speak directly to the undersigned and

8    proclaimed: "I'm standing up for my rights.  I'm a veteran and I'm

9    pissed.  I'm very, very, very upset.  I don't like the tactics

10   they're trying to pull.  I don't like what the federal courts are

11   trying to pull.  And like I said, I will go to the media."  The

12   overall tone of this message was threatening, not only towards

13   Defendants but also towards the Court itself.

14       In response to Plaintiff's hostile messages, the Court

15   convened a status hearing on January 6, 2011, at 8:00 a.m., despite

16   the fact that the undersigned had the "criminal duty" responsibili-

17   ties during that week and civil matters are generally not heard as

18   a result.   The Court held the hearing on the record, ordered

19   Plaintiff's  personal  appearance  to  avoid  another  disruptive

20   telephone conference, and allowed counsel for Defendants to appear

21   telephonically.  The Court again took the extraordinary measure of

22   having United States Marshals personnel present in the courtroom

23   during a civil proceeding.

24       Before the Court, Plaintiff was more subdued but nonetheless

25   expressed his dissatisfaction with what he perceived as stall

26   tactics and gamesmanship by Defendants.  This perception was based

27   on his belief that he had an ironclad case and his resulting

28   displeasure that Defendants refused to immediately pay him all of

the money he demanded.  Essentially, Plaintiff was frustrated that Defendants would not simply capitulate to his demands and actually wanted to litigate the case.  He interpreted all of this as a sign that they intended to unnecessarily prolong the case.  In response, the Court explained that Defendants had the right to litigate the cases, just as Plaintiff did, and explained that the scheduling order was standard and was not a result of Defendants' desire to drag the case out.  The undersigned further admonished Plaintiff about the aggressive and threatening nature of his communications with the Court, advised him that such behavior was not acceptable, and generally cautioned him that sanctions may be forthcoming for continued unacceptable behavior.  The undersigned also advised Plaintiff against engaging in further substantive *ex parte* communications with the Court.

### 4.  __March 25, 2011:  Discovery Hearing__

On March 25, 2011, the undersigned convened a discovery hearing after Plaintiff apparently refused to answer several special interrogatories.  The Court also learned that Plaintiff continued to engage in unacceptably aggressive and threatening behavior towards defense counsel.  Specifically, Plaintiff continued to leave threatening voicemail messages for counsel, including the following transcribed message from March 16, 2011:

> Hey Sam Sherman.  How dumb do you think I am?  Man you're stupid, do you know what?  Okay, now I want to see all the citations I signed.  There was only one. So like I say, and one I didn't sign, and I never did sign it, because it started with a J, which was Jerrod Gresset forged my signature, so I didn't sign nothing. So you know what, here's the deal, I'm gonna fuck you just for that man.  You're through, okay?  Your season is over with man, I'm telling you.  This is fun.  I love this shit.  Oh man, this is great.  You're an idiot man, but it's gonna be fun.  I'm gonna fuck you for this.  I'm going to the library right now and type

1    this shit up, ask for a motion for summary judgment,
     and I'm gonna demand [word emphasized] that the judge
2    give me that summary judgment.  Therefore, I take over
     the company.  Fuck you and the horse you rode in on,
3    okay.  Later.

4    (Doc. No. 75 at 4.)[3/]  The Court read this transcribed message to

5    Plaintiff, who confirmed its accuracy: "Yeah.  I was pissed.  I was

6    upset, very upset, because of what they're trying to do -- motion to

7    bring people into my life and invade my private life.  I don't like

8    that.  That's what they're trying to do.  They want to find out my

9    address, where I live at -"  (Doc. No 83 at 9:11-15.)

10         After recounting Plaintiff's continued behavior, the Court

11   verbally admonished him that continued obstreperous or obstructive

12   conduct could result in sanctions, including a recommendation that

13   his cases be terminated.  The Court then ordered Plaintiff to

14   respond to certain special interrogatories with guidance on how he

15   could answer them.

16         After the hearing, the undersigned issued a written order

17   that reiterated the verbal orders above and again specifically, and

18   in detail, admonished Plaintiff that sanctions could issue.  (Doc.

19   No. 75.)  Specifically, Plaintiff was admonished in no uncertain

20   terms that case-dispositive sanctions could be recommended and

21   imposed if he continued his unacceptable behavior, failed to

22   prosecute, or further delayed his three cases.  (Id. at 4-6.)

23   C.    **Other Examples of Plaintiff's Behavior**

24         The Court also has had the opportunity to witness Plaintiff's

25   general conduct and attitude towards Defendants and their counsel by

26   examining the various correspondences and discovery responses he has

27

28
     _____
     3/ All page number references to documents on the Court's docket refer to the CM/ECF
     pagination, not the document's native pagination.

1    sent them.  Overall, Plaintiff employs a hostile, argumentative tone

2    and engages in personal attacks, even in his discovery responses.

3    Sometimes Plaintiff sprinkles barbs and jabs in with responsive

4    answers, and other times his responses are completely non-respon-

5    sive.  In sum, his writings in general resist cooperation and seek

6    to make the litigation process as difficult for Defendants as he

7    possibly can.  The following are some illustrative examples:[4]

8       • Find the numbers yourself-lawyers[.]  (Doc. No. 88-4 at
          16.)
9
        • No, never convicted of a felony, have you, what you are
10        trying to do is get into my life in which by law has
          nothing to do with any of the cases at all, it called
11        invasion of privacy.  (Id.)

12      • I wasn't working at that time but, looking for work,
          this is bull your going to pay no matter what.  (Id. at
13        20.)

14      • I stated all facts in the complaints so read that, I'm
          not typing this over again period.  (Id.)
15
        • U.C.S.D.-phone number is in the book.  (Id. at 30.)
16
        • This letter is in response to the special interrogato-
17        ries that I answered I think fairly enough and this is
          just one of your delay tactics will it's not going to
18        work.  All the questioned were answered your going to
          have to work on your part to get the rest.  But this is
19        what you will get from me.  (Id. at 37.)

20      • You will see both papers from U.C.S.D. and Scripps
          Hospital (09cv1141) you better come with an offer before
21        the 15th of March or if I have to wait until July 27th
          at 2:00pm it doubles, if we go to trial it triples, and
22        if you are really as dumb as I think you are and appeal
          it quadruples and I can and will do it just try me.
23        (Id.)

24      • [I]f your stupid enough to go to trial I'm going to
          hammer you under [Section] 1983.  (Id.)
25
        • No you have all the forms that are there do some work,
26        I'm done doing your work for you.  (Id. at 55.)

27

28
     _____
     4/ For the sake of readability, the undersigned will refrain from the use of "[sic]" when
     directly quoting Plaintiff's writings.  All direct quotations appear as written.

                                    8                    09CV882, 09CV898, 09CV1141

1   • Look I've lost sight in my right eye to the point where
2   I'm going blind so you better get up off your asses and
    get this over with.  (<u>Id.</u>)

3       Moreover, the following examples appear in Plaintiff's

4   opposition to the instant motion and reflect the type of

5   nonsensical, irrelevant rants he engages in:

6   • You have nothing, Heritage Security attorney are trying
    to bring back the case over two years and they don't
7   have proof that I was drunk in public or that a crime
    was ever committed, and it's coming back to bit you in
8   the ass.  (Doc. No. 94 at 3.)

9   • Also this is a racial matter now in which that I'm a
    strong willed black man without the major **Dollars** they
10  think they can do what they want, but it is not so they
    are trying to pay off the SDPD and the state courts
11  with there money because or so-called campaign contri-
    butions to the city attorney's office or have the city
12  attorney office due favors for Higgs, Fletcher, Mack
    you will see [J]udge Gallo and [J]udge Moskowitz from
13  this called drunk in public case with no M number or
    date when this event accurred one hand washes the
14  other, how desperate and crooked Higgs, Fletcher, Mack
    are.  (<u>Id.</u> (emphasis in original).)
15
16  • I'm going to sue the San Diego City Attorney's Office
    and also the law firm of Higgs, Fletcher, Mack and for
17  discriminatory acts against me and also have Sam
    Sherman disbarred watch how I do this and watch how I
18  tear apart Higgs, Fletcher, Mack they don't have any
    blacks working for them at all.  They discriminate
19  against our race in ways watch.  Fletcher, Higgs, and
    Mack tried to already come at me before with bogus
20  stuff and there trying again and this time there going
    down there mad because there getting their butts hand
21  to them and they did not expect this, **SURPRISE.**  (Doc.
    No. 94-1 at 7 (emphasis in original).)

22  D.   <u>**Developments Since The March 25, 2011, Hearing**</u>

23      Two developments since the March 25, 2011, hearing form the

24  basis for Heritage's motion:  (1) Plaintiff's continued refusal to

25  respond to interrogatories despite a court order and (2) Plaintiff's

26  lie about being represented by counsel to successfully avoid being

27  deposed.  Each will briefly be set forth immediately below, but

28  discussed more fully in Section II.

9

1        **1.   <u>Refusal to Respond to Interrogatories</u>**

2        At the March 25, 2011, discovery hearing, the undersigned

3   ordered Plaintiff to supplement his interrogatory responses to (1)

4   provide his home address, (2) identify his lost wages damages and

5   how he calculated them, and (3) identify any witnesses or state that

6   he does not know the identity of any witnesses. (Doc. No. 75 at

7   1:25-2:2.)  Plaintiff continues to refuse to provide Heritage his

8   home address, but partially responded to the last two interrogato-

9   ries.  As to the damages interrogatory, Plaintiff identified his

10  damages but did not identify how he calculated them.  As for the

11  witness interrogatory, without stating that he does not know the

12  identity of any witnesses, he states that he could not see any

13  witnesses because he was face-down on the ground as the security

14  officers took him into custody.

15       As explained below, Plaintiff's answer to the latter two

16  interrogatories appear acceptable given Plaintiff's *pro se* status.

17  However, the undersigned views Plaintiff's continued refusal to

18  provide his home address a violation of a direct court order and a

19  deprivation of Heritage's ability to investigate Plaintiff's claims

20  and defend itself.

21       **2.   <u>Plaintiff Lied to Avoid Deposition</u>**

22       In early 2011, Plaintiff foreshadowed that he would avoid

23  being deposed.  In the concluding paragraph of a February 27, 2011,

24  letter that supplemented discovery responses, he wrote:  "This is

25  all your getting from me move on I don't have to give you anything

26  else unless you ask for a deposition in person in which your not

27  going to get, just tell owner of heritage security to give it up or

28  I going to take his company." (Doc. No. 88-4 at 56.)  Then, when

10                                        09CV882, 09CV898, 09CV1141

1  the time for his deposition finally arrived, Plaintiff appeared

2  alone on April 28, 2011, and stated he had found legal counsel who

3  had advised him to not answer any questions.  Plaintiff identified

4  his counsel as "Alan Speers."[5/]   Based on this representation,

5  Defendants, who had arranged for the presence of both a stenographer

6  and a videographer, immediately ceased the deposition in order to

7  avoid continued contact with a represented party and memorialized

8  these events on the record:

> The time is now 10:10, and Mr. Lowry has appeared
> at the deposition.  He indicates he will not go forward
> with the deposition, that he's retained an attorney.
> The attorney's name is Alan Speers, S-p-e-e-r-s, with
> the Law Offices of Alan Speers.
>       I've tried to contact Mr. Speers and left a
> message for him on his cell phone.  Apparently, Mr.
> Speers has indicated to Mr. Lowry that he's not to say
> anything at this deposition, so he does not intend to.
> So the deposition will not go forward, and we will
> renotice the deposition through Mr. Speers.
>       I'll just point out that there has not been a
> substitution of attorneys filed in this case nor has
> Mr. Speers tried to contact my office to advise that
> he's now serving as counsel of record to Mr. Lowry.

17  (Ex. K to Motion, Transcript of Deposition, Doc. No. 88-4 at 70-71.)

18  Counsel then asked Plaintiff whether he was going to say anything,

19  and Plaintiff silently shook his head.  (Id. at 71.)

20       After the failed deposition, counsel was able to speak with

21  Mr. Spears, who "emphatically denied he represented Plaintiff and

22  denied advising Plaintiff not to testify."  (Motion, Doc. No. 88-1

23  at 4.)  Mr. Spears graciously appeared at the June 20, 2011,

24  sanctions hearing and provided on-the-record testimony about his

25  actual conversation with Plaintiff.

26       Mr. Spears testified that he first met Plaintiff as he ate an

27  omelet at a Denny's restaurant in National City at 4:00 a.m. on

28

---

5/  The correct spelling of this attorney's last name is actually "Spears."

Easter Sunday.[6/]   Their conversation initially centered on their common experience in the military, and Mr. Spears eventually told Plaintiff that he was an attorney.  Plaintiff informed Mr. Spears that he had to attend a deposition in the coming week and had been having difficulty finding an attorney to represent him.  Plaintiff asked whether Mr. Spears was willing to represent him, and Mr. Spears responded that he would evaluate Plaintiff's case and would then determine if he would represent him.  Mr. Spears gave Plaintiff a personal contact card and instructed him to drop off any paperwork he had at Mr. Spears's office for review.

At the sanctions hearing, the Court questioned Mr. Spears about meeting Plaintiff and what he specifically conveyed to Plaintiff.  With respect to Plaintiff's representation that Mr. Spears represented him, the Court engaged Mr. Spears in the following questioning:

THE COURT:  Mr. Lowry represented -- and you touched on this already but let me ask you specifically - Mr. Lowry represented at the deposition that he had retained an attorney or hired an attorney or is now represented by an attorney or words to that effect. During your brief meeting with Mr. Lowry at the Denny's on Easter Sunday, did you at any time repre-sent to Mr. Lowry that you were now his attorney, retained or otherwise?

MR. SPEARS:  Absolutely not, your Honor.  . . . .

THE COURT:  Did you say anything -- looking back in your mind's eye, did you say or do anything that could have conveyed the impression to Mr. Lowry that you are now his attorney and had entered into an attorney-client relationship with him?

MR. SPEARS:  Absolutely not, your Honor.  I told him I wouldn't do anything until I had a chance to look over the pleadings.  He said he'd make an entire copy of his file.  He'd bring it by the office.  I told him if he did that, I would be happy to take a look

_____

6/   Easter Sunday fell on April 24, 2011, this year.

1      at it, discuss it with my law partner, and set him up
       for an appointment.
2

3   (Transcript of Hearing, Doc. No. 98 at 21:21-22:19.)

4          With respect to the Plaintiff's representation that Mr.

5   Spears instructed him not to answer deposition questions, Mr. Spears

6   testified:

7          Mr. Spears:  . . . .  I never told him not to testify at
          a deposition.  I've been a member of the bar of this
8          court since a long time ago, and I knew -- I know better
          than to tell a person not to testify at a scheduled
9          deposition, your Honor.

10         . . . .

11         THE COURT:  Mr. Lowry also had indicated that on April
          28th, the day of the deposition, that he was instructed
12         not to answer any questions.  Did you represent -- you
          already talked about this a moment ago, but did you
13         specifically tell him that he was not to answer any
          questions at the deposition?
14
          MR. SPEARS:  Absolutely not, your Honor.
15
          THE COURT:  Did you even discuss the deposition and what
16         he should or shouldn't do there?

17         MR. SPEARS:  No, your Honor, other than the fact that I
          told him that he might want to consider -- he said, "I
18         have a deposition next week," or whenever the deposition
          was set.  I said, "Well, you might want to consider
19         asking the other side for a continuance."  That was all
          that I said in relation to the deposition.
20
          THE COURT:   Is there anything -- again, asking you to
21         look back, is there anything that you said or did that
          could have conveyed the message that Mr. Lowry should not
22         have and shouldn't answer any questions when he arrived
          at the deposition?
23
          MR. SPEARS:  Absolutely not, your Honor.
24

25  (Id. at  20:4-8;  23:9-24:4.)    Mr. Spears  also  testified  that

26  Plaintiff did not appear confused about what Mr. Spears meant by

27  "asking the other side for a continuance" and did not ask any

28  follow-up questions about how he could go about doing so.  (Id. at

                                    13                09CV882, 09CV898, 09CV1141

1    27:22-28:9.)  In fact, Mr. Spears believed Plaintiff knew what this

2    meant:  "Mr. Lowry spontaneously told me that he was an experienced

3    paralegal and that he had been conducting this litigation in pro

4    per, and he seemed, what little bit I did speak with him, fairly

5    conversant in some legal terms, so I didn't get into [how to seek a

6    continuance] with him."  (<u>Id.</u> at 28:1-5.)

7           After Mr. Spears's testimony, the undersigned questioned

8    Plaintiff about the representations he had made to Heritage's

9    counsel at the deposition and the basis for his statements:

10       THE COURT:  And did you believe that Mr. Spears was your
         attorney after that 10- or 15-minute conversation?
11
         MR. LOWRY:  In a way -- in a way --
12
         THE COURT:   Let me finish the question before you
13       respond, all right?  **Did you believe that Mr. Spears was
         your attorney?  He represented you?**
14
         MR. LOWRY:  **In a way, I thought that he, you know, he
15       expressed interest. He expressed interest, you know. Me
         thinking -- I just wanted help.**
16
         THE COURT:  **I understand that, but did you think that he
17       was your attorney as of that day?**

18       MR. LOWRY:  **I don't know.  I can't say.  I don't know.
         He talked like he could, but I don't know.**  I just -- you
19       know, it was 4:00 o'clock in the morning.

20       THE COURT:  All right.  **Now, did Mr. Spears tell you not
         to answer questions at your deposition?**
21
         MR. LOWRY:  **No, he didn't tell me**, and he told me like
22       this that I could take the time, yeah, to push it back.
         I'm -- I wasn't trying to do anything illegal by that.
23
         THE COURT:  I'm not asking you that.
24
         MR. LOWRY:  Yeah, but --
25
         THE COURT:   But did you contact the attorneys for
26       Heritage or MTS and ask for a delay in the deposition?

27       MR. LOWRY:  No, I didn't.  No.

28       THE COURT:  And when you got to the deposition, did you
         ask for a delay at that point?

14

1    MR. LOWRY:  I -- to retain counsel.

2    THE COURT:  No.  No.

3    MR. LOWRY:  To retain counsel.

4    THE COURT:  **Well, from what I've read, you told them that**
**you were not going to answer any questions because your**
5    **attorney told you not to answer questions.**

6    MR. LOWRY:  **I stated -- well, yeah, I did state it like**
**that, but I should have stated it another way.**  Like I
7    told you, I'm not the most experienced person in the
world.
8
THE COURT:  Yeah, but the truth is the truth.
9
MR. LOWRY:  Yeah.
10
THE COURT:  You don't have to be experienced to tell the
11   truth.

12   MR. LOWRY:  Yeah.  Well, that's what I stated, and, like
I say, I wasn't trying to delay anything.  They can ask
13   any questions they want, but the questions that I stated
in my complaints are the truth, and that's all I have to
14   state right there. . . . .

15   THE COURT:  But you -- but you lied to the attorneys for
Heritage --
16
MR. LOWRY:  I didn't lie to them.
17
THE COURT:  -- saying that you had an attorney, and your
18   attorney told you not to answer questions at the deposi-
tion.
19
MR. LOWRY:  I did not lie to them about that.  No, I
20   didn't.  They might have misconstrued it, but I didn't
lie about it. I --
21
THE COURT:  What did you tell them, then?
22
MR. LOWRY:  Okay.  What I told them that I found out, you
23   know, that I don't have to answer any of the questions
that I -- any of the questions at the deposition.  They
24   even stated -- they even stated that, you know, I can
leave at any time of the deposition if the questions were
25   too hard or whatever or, you know, the questions you feel
that are used as trick questions, but MTS was conducting
26   this.  Now, I'm not trying to hide nothing.  I ain't got
nothing to hide.  I have nothing to hide at all, and as
27   far as the deposition is going -- was to go, I wasn't
ready.  I wasn't ready for it.  Mentally -- no.  Mentally
28   I wasn't ready.  And I should have said continuance, used
a different word.  I'm not trying to delay everything.

1    That's what they're saying -- I'm trying to delay the
     process.  No, I'm not.  What they tried to do was spy on
2    me.

3    THE COURT:  I'm not asking you about that.

4    MR. LOWRY:  No, but I'm just saying that.

5    THE COURT:  Mr. Lowry, I'm asking you about the deposi-
     tion.
6
     MR. LOWRY:  Yeah, but I wasn't trying to delay the
7    process, and I didn't, you know, as far as lie to them,
     no.  I just --
8
     THE COURT:  But you did tell them --
9
     MR. LOWRY:  -- they -- I did show them the card, who I
10   talked to.

11   THE COURT:  **So you told them that you had an attorney,
     his name was Alan Spears, and he told you not to answer
12   any questions.  That's what you said.  Is that right or
     wrong?**
13
     MR. LOWRY:  **He didn't tell me as far as answering no
14   questions.  He didn't say that.**

15   THE COURT:  I'm not asking you what he told you.  **I'm
     asking you what you told the attorneys at the deposition.**
16
     MR. LOWRY:  **What I told the attorneys at the deposition
17   is that I'm trying to retain counsel.  That's all.**  With
     counsel -- I'm allowed to have counsel . . . .
18
     THE COURT:  Okay.
19
     MR. LOWRY:  But, no, hold on.  I didn't lie about
20   anything.  I didn't.  I'm trying to retain him.  And I
     think that's fair. . . . .
21
     . . . .
22
     MR. LOWRY:  That's all I was trying to do, your Honor.
23
     THE COURT:  Well, did you tell them that you were trying
24   to retain counsel or that you in fact had retained
     counsel and that his name was Alan Spears, and that Alan
25   Spears told you not to answer any questions?

26   MR. LOWRY:  Alan Spears stated that "you really don't
     have to answer anything.  You're trying to retain
27   counsel.  You can put it off."  I should have said that,
     your Honor.  I should have said that, yes.  I should have
28   said it.  I should have said it, but --

1    THE COURT:  All right, Mr. Lowry.

2    MR. LOWRY:  -- I'm just trying to put it off.  That's
     all.  I'm not trying to, you know, like I say, deceive
3    the Court or deceive them at all.  At all.

4  (Id. at 39:19-44:6 (emphasis added).)

5                    II.  LEGAL STANDARD

6         The Court may impose broad discovery sanctions for failure to

7  obey a court order that compels discovery, up to and including

8  "dismissing the action or proceeding in whole or in part."  Fed. R.

9  Civ. P. 37(b)(2)(A)(v).

10        Dismissal and default are appropriate only when circumstances

11  evidence willful disobedience of court orders or bad faith conduct.

12  Fjelstad v. Am. Honda Motor Co., 762 F.2d 1334, 1337 (9th Cir.

13  1985).  "'[D]isobedient conduct not shown to be outside the control

14  of the litigant' is all that is required to demonstrate willfulness,

15  bad faith, or fault."  Henry v. Gill Indus., Inc., 983 F.2d 943, 948

16  (9th Cir. 1993) (quoting Fjelstad, 762 F.2d at 1341).  The Court may

17  consider the party's motivations, and can consider his "dilatory and

18  obstructive conduct" in the case and other related cases.  See Smith

19  v. Smith, 145 F.3d 335, 344 (5th Cir. 1998).

20        In addition to a finding of willfulness or bad faith, the

21  Ninth Circuit has provided the following five nonexclusive factors

22  that the sanctioning court may use to determine whether case-

23  dispositive sanctions are just:

24        (1) [T]he public's interest in expeditious resolution of
              litigation;
25        (2) the court's need to manage its dockets;
          (3) the risk of prejudice to the party seeking sanctions;
26        (4) the public policy favoring disposition of cases on their
              merits; and
27        (5) the availability of less drastic sanctions.

28  Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills, 482 F.3d

                                  17

1091, 1096 (9th Cir. 2007).  Because "factors 1 and 2 support
sanctions and 4 cuts against case-dispositive sanctions, . . .
[factors] 3 and 5, prejudice and availability of less drastic
sanctions, are decisive." <u>Valley Eng'rs v. Electric Eng'q Co.</u>, 158
F.3d 1051, 1057 (9th Cir. 1998).  Further, "factor 5 involves
consideration of three subparts:  whether the court explicitly
discussed alternative sanctions, whether it tried them, and whether
it warned the recalcitrant party about the possibility of dis-
missal."  <u>Id.</u>  "[W]hat is most critical for case-dispositive
sanctions, regarding risk of prejudice and of less drastic sanc-
tions, is whether the discovery violations 'threaten to interfere
with the rightful decision of the case.'"  <u>Id.</u>

### III.  <u>DISCUSSION</u>

Since the March 25, 2011, discovery hearing, Plaintiff
continued to engage in unacceptable conduct, and Heritage continues
to incur costs and attorneys' fees in an attempt to defend itself.
As a result, Heritage's pursuit to defend itself has become
exceedingly and unreasonably difficult thanks to Plaintiff's active
efforts to delay and obstruct the litigation process.  Plaintiff
violated a court order and actively lied about being represented by
counsel to avoid being deposed.  Moreover, Plaintiff lied to the
undersigned in open court at the sanctions hearing.  These acts,
Plaintiff's previous conduct, the inefficacy of the Court's warnings
and orders, and the anticipated inefficacy of lesser sanctions all
combine to inform the undersigned's strong belief that the only
sanction that is practically available to the Court is to dismiss
Plaintiff's cases against Heritage.

**A.      Plaintiff Has Acted With Willful Disobedience and Bad Faith**

Heritage bases its motion on (1) Plaintiff's willful disobedience of the Court's March 25, 2011, order that he respond to certain interrogatories and (2) his bad faith conduct in connection with his deposition.  The undersigned addresses each in turn.

**1.    Willful Disobedience of Court Order**

On March 25, 2011, the Court ordered Plaintiff to provide supplemental responses to the three special interrogatories below. Although it appears Plaintiff technically failed to fully respond to two of the three interrogatories, the undersigned is most concerned about Plaintiff's refusal to provide Heritage his residence address.

**a.    Request for Identification of Witnesses**

Special Interrogatory 14 in the 09-CV-898-BTM(WVG) case asks that Plaintiff "state the name, address, and telephone number of all" witnesses. (Ex. B, Doc. No 88-4 at 11.) Plaintiff's original and pre-hearing supplemental responses were essentially vague references to people who were generally in the area when he and security personnel clashed.

At the March 25, 2011 discovery hearing, the Court asked Plaintiff whether he knew the names of any persons who potentially witnessed the events in his amended complaints.  He stated that he could not identify any witnesses.   The Court instructed him to supplement his response and to merely state that he did not know who the witnesses were.   It was clear to all that he could not identify any witnesses. Plaintiff's subsequent supplemental response, though more verbose and confusing than necessary, essentially followed the Court's direction and more or less responded that he did not know

19

1   who the witnesses were.  (Ex. I, Doc. No. 88-4 at 64.)  Heritage now
2   claims that this supplemental response is incomplete.

3        Technically,  Heritage  is  correct.    Plaintiff  did  not
4   expressly state that he did not know who the witnesses were, as the
5   Court instructed him to do.  Rather, he states that he could not see
6   any witnesses, which necessarily implies he cannot identify them.
7   The undersigned is not concerned with Plaintiff's response to this
8   interrogatory  because  it  is  abundantly  clear  to  everyone  that
9   Plaintiff cannot identify any witnesses.  He stated as much on the
10  record at the March 25, 2011, discovery hearing.  As a result, the
11  undersigned does not view Plaintiff's response to this interrogatory
12  as a material violation--though it is a technical violation--of the
13  discovery order.

14        **b.   <u>Request for Amount and Calculation of Damages</u>**

15        Special Interrogatory 18 in the 09-CV-898-BTM(WVG) case asks
16  Plaintiff to "state the amount of lost income" he claims and explain
17  "how that amount was calculated."  (Ex. B, Doc. No 88-4 at 12.)
18  Plaintiff originally defiantly refused to respond:  "The amount that
19  was calculated should not matter Heritage Security will be taught a
20  valuable lesson this millions of dollars no matter what." (Doc. No.
21  88-4 at 20.)  He then supplemented his response but still provided
22  no specifics.  (Doc. No. 88-4 at 38, 56.)

23        At the discovery hearing, the undersigned provided Plaintiff
24  the following guidance on how to respond:  "You're getting a little
25  closer  to  what  we're  talking  about  here,  but  what  we're  talking
26  about is, tell me how much you lost, $1,000, $2,000, [$]100,000 -
27  whatever it is."  (Doc. No. 83 at 27.)  Plaintiff was also in-
28  structed to explain how he calculated his claimed lost wages.  (<u>Id.</u>)

1    After the hearing, Plaintiff provided the following supplemental

2    response on March 28, 2011:

> I would have made $15.00hr as a forklift operator but for
> some reason be on my control they do back round checks
> and come to find out Heritage and Metropolitan Transit at
> the time I was fighting the first case was trying to find
> work at the same time some how the company found out that
> I was still fighting the first case, but add the hospital
> bill along with what I could have made six to eight weeks
> over $7,000.00 along with the hospital bill which totaled
> over $5,000.00.  This is my answer to interrogatory 18
> (09cv0989) but in punitive and compensatory damages it
> will run to millions.

9    (Ex. I, Doc. No. 88-4 at 64.)  From this response, the Court gathers

10   that Plaintiff claims a total of $2,000 ($7,000 total loss minus

11   $5,000 hospital bill) in lost wages that he would have earned over

12   the course of six to eight weeks as a forklift operator making

13   $15.00 per hour.  Given that Plaintiff is proceeding *pro se*, this

14   response is sufficiently responsive and complies with the Court's

15   order.  Although Plaintiff does not provide the method he used to

16   arrive at the $2,000 figure, reverse calculation of that number is

17   possible based on the other information he provides.  Because it

18   appears Plaintiff did his best to provide an answer, the undersigned

19   does not believe Plaintiff's supplemental response is a willful

20   violation of a court order.

21                    c.   **Request For Plaintiff's Residence Address**

22        Special Interrogatory 4 propounded in the 09-CV-1141-BTM(WVG)

23   case simply asks Plaintiff to state his "present residential

24   address." (Doc. No 88-4 at 5.)  This interrogatory is routinely

25   propounded in civil cases, but Plaintiff has refused to answer it

26   because he does not wish to be investigated or surveiled.  The

27   undersigned deems Plaintiff's continued refusal to answer this

28   interrogatory a direct violation of a court order.

1    At the March 25, 2011, discovery hearing, the Court accepted

2  Heritage's proffered reason for this interrogatory's relevance and

3  ordered Plaintiff, both verbally and in writing, to respond.  (Doc.

4  No. 75 at 2:1-2; Doc. No. 83 at 32:1-8.)

5    On March 28, 2011, Plaintiff served the following supplemen-

6  tal response:

    This is the answers for the Interrogatories that I've already
7    I'm staying with friends who have let me use there motor home
    to stay and they don't want know one snooping around there
8    house or asking questions about me so I've given you the best
    that I could, I'm not violating there right to privacy at
9    all, you wanted to know where I was staying and the motor
    home is very nice, that's all you can get from me right now.
10   I will not jeopardize my friendship for this attorney.  This
    is my answer to interrogatory No. 4 (09cv1141).
11

12  (Ex. I to Motion, Doc. No. 88-4 at 63-64.)   This answer followed

13  multiple meet and confer efforts by Heritage, multiple supplemental

14  responses, a hearing, and the Court's direct order that Plaintiff

15  provide his address.   In the March 25, 2011, hearing, Plaintiff

16  stated he understood that he was to provide Defendants his residence

17  address.  (Doc. No. 83 at 32.)

18    At the sanctions hearing, Plaintiff explained why he refused

19  to prove his home address, as the Court ordered him to do:

    I gave them an address.  I stayed with my friend in his
20   motorhome, but I did not want to get his family involved in
    and them trying to follow me around.   That's what they
21   basically wanted to do, and it's an invasion of privacy,
    especially my friend's family.  He has kids.
22

23  (Doc. No. 98 at 31:8-13.)   However, Plaintiff did not provide

24  Heritage an address; merely stating that one lives in a motor home

25  somewhere fails to disclose the precise location of the motor home.

26  In response, Heritage provided the following explanation for the

27  necessity of Plaintiff's home address:

28

                                22                09CV882, 09CV898, 09CV1141

1        Mr. Lowry's going to be able to say, "Well, I make
         claims for continuing eye injuries, continuing vision
2        problems," and we can't conduct any sub rosa to see
         if that's true or not, to see what sort of activities
3        Mr. Lowry's engaging in.  Meanwhile, we have medical
         records that indicate in fact the doctors can't
4        explain how Mr. Lowry has these subjective complaints
         of eye injuries and how his eye injuries haven't
5        fully healed.

6   (Id. at 49:18-25.)  In other words, Heritage needs an avenue to

7   investigate Plaintiff's unsubstantiated and medically inexplicable

8   persisting injuries.  Heritage's explanation for why it needs

9   Plaintiff's address is more than reasonable and is precisely why the

10  undersigned originally ordered Plaintiff to disclose his address.

11  Plaintiff has invoked an unspecified blanket right to privacy on his

12  own behalf and on behalf of the family with whom he lives.  However,

13  Heritage has no interest whatsoever in the host family--only

14  Plaintiff.  Any privacy interest Plaintiff has in his own residence

15  address is not absolute, as Plaintiff wishes, and in this case is

16  overwhelmed by Heritage's compelling reasons:  relevance grounds,

17  Plaintiff's unexplained injuries, and Heritage's right to garner

18  information to defend itself in the three cases that Plaintiff

19  himself brought.  See generally Ragge v. MCA/Universal, 165 F.R.D.

20  601, 604-05 (C.D. Cal. 1995) (discussing balancing of interests).

21        Unlike the other interrogatories at issue, the undersigned

22  does not consider trivial Plaintiff's past and continued refusal to

23  answer this interrogatory.  Defendants are entitled to investigate

24  Plaintiff himself in order to develop defense strategy, including

25  potential information for impeachment purposes. Without Plaintiff's

26  residence address, Heritage is deprived of an entire avenue of

27  litigation strategy that could lead to the discovery of admissible

28  evidence or develop information that could assist in their defense.

1    Plaintiff's staunch refusal to provide this information, in light of
2    Plaintiff's alleged eye injuries, thus constitutes a partial
3    deprivation of Heritage's right to defend itself.[7] Plaintiff's
4    desire not to be surveiled is utterly immaterial.  After bringing
5    three cases against Heritage, he cannot now cabin, without any valid
6    legal basis, Heritage's ability to defend itself whenever the urge
7    strikes him.

8         Plaintiff's refusal to provide his residence address
9    apparently also has created other practical problems, as his current
10   mailing address on the Court's docket is a P.O. Box in National
11   City, CA.  However, Heritage's counsel recently declared that his
12   office had served Plaintiff with a copy of their opposition to his
13   summary judgment motion, but that it was returned as "unclaimed."
14   (Doc. No. 92 at 1-2, 20.)  Heritage re-served its opposition on June
15   2, 2011, to ensure that Plaintiff has a fair opportunity to reply.
16   Had Heritage known Plaintiff's residence address, they simply could
17   have mailed the opposition to that address.  However, despite
18   Plaintiff's reassurance that his P.O. Box remains a valid mailing
19   address, both the Court and Heritage are now left to wonder whether
20   he will receive future orders, notices, or other paperwork critical
21   to his cases.[8]

22        The undersigned deems Plaintiff's continued refusal to
23   provide his residence address, despite his understanding that he was
24   ordered to provide it, a direct and willful violation of a court
25   _____

26   [7] The Court does not share Plaintiff's concern that his safety may be at jeopardy if he
     discloses his address.  Defendants and their counsel have not given the Court any reason
27   to believe that Plaintiff's physical well-being is in jeopardy.

     [8]  The Court asked Plaintiff whether he specifically received the March 25, 2011,
28   sanctions warning order.  Plaintiff initially emphatically stated that he had received it,
     but then went on to theatrically read the order the Court provided him, equivocate whether
     he had received it, and respond out loud to the order as he read it.

1  order.   No ambiguity existed in the Court's order that he was to
2  provide his "present address, where [he went] every day to live."
3  (Doc. No. 83 at 32.)   Plaintiff expressed no confusion about the
4  Court's order and stated three times that he understood what he
5  needed to do.   (Doc. No. 83 at 32 ("Okay," "I got you," and "No
6  problem.").)   Given that he fully understood the Court's order, the
7  undersigned can interpret Plaintiff's defiant supplemental response
8  above only to mean that he has chosen not to comply.

9         **2.   Bad Faith Conduct**

10         Heritage also argues that Plaintiff's conduct in successfully
11  avoiding deposition constitutes bad faith conduct.   Heritage argues
12  that  the  events  recounted  above  lead  to  the  conclusion  that
13  "Plaintiff lied about retaining counsel simply to avoid testifying
14  at his deposition.   This deceptive tactic was designed to delay,
15  disrupt and stifle discovery.   If this litigation is allowed to
16  proceed, Plaintiff will certainly continue to evade discovery[,]
17  making it impossible for Heritage to defend itself." (Doc. No. 88-1
18  at 4.)   The undersigned finds that the weight of evidence overwhelm-
19  ingly supports the conclusion that Plaintiff lied and acted in bad
20  faith to avoid deposition and frustrate Heritage's pursuit of the
21  truth.

22         Plaintiff's testimony at the sanctions hearing reveals at
23  best that he was not mentally prepared for the deposition and at
24  worst  that  this  was  yet  another  intentional  ploy  to  obstruct
25  Defendants' legitimate efforts at obtaining discovery. (Doc. No. 98
26  at 42:8-10.)   He admitted that he did not have any basis to believe
27  that Mr. Spears actually represented him.   (<u>Id.</u> at 39:22-40:7 ("I
28  don't know.   I can't say.   I don't know.   He talked like he could,

1    but I don't know.  I just -- you know, it was 4:00 o'clock in the
2    morning.").)   Plaintiff's equivocal testimony, juxtaposed with Mr.
3    Spears's credible testimony, leaves no doubt in the undersigned's
4    mind that Plaintiff did not mistakenly believe that Mr. Spears
5    represented him, especially since Mr. Spears told Plaintiff that he
6    would first review Plaintiff's files and then discuss representa-
7    tion.  (Doc. No. 98 at 23:18-23.)  Despite lacking a valid basis to
8    believe Mr. Spears represented him, Plaintiff appeared at deposition
9    and told counsel that he was then represented by counsel and that
10   counsel had advised him not to answer any deposition questions.
11   There is no doubt that Plaintiff did this, and Plaintiff did not
12   object whatsoever at the deposition when counsel stated on the
13   record "that [Plaintiff has] retained an attorney.  The attorney's
14   name is Alan Speers . . . with the Law Offices of Alan Speers. . .
15   . .  Apparently, Mr. Speers has indicated to Mr. Lowry that he's not
16   to say anything at this deposition, so he does not intend to."
17   (Doc. No. 88-4 at 70-71.)  Nonetheless, Plaintiff appeared before
18   the Court and lied directly to the Court twice about what he told
19   counsel on that day:  "What I told them that I found out, you know,
20   that I don't have to answer any of the questions that I -- any of
21   the questions at the deposition," and "What I told the attorneys at
22   the deposition is that I'm trying to retain counsel.  That's all."
23   (Doc. No. 98 at 41:24-42:1; 43:8-10.)  These blatant falsehoods are
24   directly contradicted by the deposition transcript as well as
25   counsel's testimony at the sanctions hearing.  (See id. at 56:23-
26   60:18 (testimony of attorney Robert Fitzpatrick.)  Plaintiff
27   clearly said much more than he will admit even to the Court.
28

1      Plaintiff also admitted that Mr. Spears in fact did <u>not</u>
2  advise him to not answer deposition questions. (<u>Id.</u> at 43:3-4 ("No,
3  he didn't tell me, and he told me like this that I could take the
4  time, yeah, to push it back.").)   Although he concedes that he
5  should have asked for a continuance, (<u>id.</u> at 43:23-44:2), the fact
6  remains that the actual words he used conveyed a wildly different--
7  and untrue--message.   Instead, without any basis in truth, he
8  represented that he was then-presently represented by an attorney
9  and that attorney had told him not to answer any questions.   The
10  undersigned can come to no other conclusion other than Plaintiff in
11  fact knowingly lied to avoid being deposed because he was not
12  "mentally" prepared.

13      Based on the above, the undersigned finds overwhelming
14  evidence that Plaintiff engaged in bad faith conduct in order to
15  avoid being deposed.   He lied both about being represented by
16  counsel and about counsel's advice that he should say nothing at the
17  deposition.   Even assuming, *arguendo*, that Plaintiff was somehow
18  mistaken that Mr. Spears represented him, he could not possibly have
19  been mistaken about Mr. Spears's alleged advice, as counsel stated
20  in no uncertain terms that he never advised Plaintiff to not answer
21  deposition questions.   The undersigned completely accepts Mr.
22  Spears's representation, as he in fact would not have had any legal
23  to give such advice.   Moreover, at the sanctions hearing, Plaintiff
24  admitted that Mr. Spears did not advise him to avoid questioning.

25      Plaintiff's intentionally deceitful conduct resulted in
26  unnecessary expense to Defendants, yet another delay of the
27  litigation process, and, more significantly, the frustration of
28  Heritage's ability to engage in one of the most widely-used and

1   informative discovery tools used in litigation today.  Based on the
2   foregoing, the undersigned finds that Plaintiff's conduct was in bad
3   faith.
4   **B.      <u>Terminating Sanctions Are Appropriate</u>**
5          After considering the five factors that bear on whether case
6   dispositive sanctions are just, the undersigned concludes that
7   dismissal <u>is</u> a just and appropriate sanction.[9/]
8          **1.    <u>Public Interest in Expeditious Resolution of Litigation</u>**
9          This factor weighs in favor of dismissal, as Plaintiff's past
10  and anticipated future conduct is the antithesis of expeditious
11  resolution.  Plaintiff has unnecessarily undermined the smooth flow
12  of litigation, and the undersigned fully anticipates that he will
13  continue to do so in the future.  Although Plaintiff routinely
14  professes that he desires to resolve these cases quickly, his own
15  actions have caused the opposite result.  Plaintiff's adamant belief
16  to the contrary notwithstanding, Defendants have done nothing to
17  delay these cases.  Moreover, Plaintiff's vision of a quick
18  resolution is simply that Heritage pays him all, or substantially
19  all, of the money he demands, which is in the multi-million dollar
20  range.  Therefore, were Plaintiff's cases allowed to proceed, the
21  public's interest in expeditious resolution of cases will very
22  likely not be satisfied.
23         **2.    <u>The Court's Need To Manage Its Docket</u>**
24         The Court's need to manage its docket is great, as the
25  Southern District of California is one of the busiest districts in
26
27  9/ The undersigned acknowledges that these factors are not "a mechanical means of
    determining what discovery sanction is just, . . . a series of conditions precedent before
28  the judge can do anything, [or] a script for making what the district judge does
    appeal-proof," but merely "a way for a district judge to think about what to do." <u>Valley</u>
    <u>Eng'rs v. Elec. Eng'g Co.</u>, 158 F.3d 1051, 1057 (9th Cir. 1998).  Nonetheless, these factors
    demonstrate that dismissal is just under the circumstances here.

1    the nation.   Despite the Court's impacted docket, Plaintiff's
2    behavior has necessitated the Court's direct intervention on
3    multiple occasions to referee disputes that ordinarily do not
4    materialize in the vast majority of civil cases on the Court's
5    calendar.   Further, Plaintiff's numerous *ex parte* communications
6    with chambers have consumed additional Court resources.   The
7    undersigned fully expects that Plaintiff's three cases will continue
8    to require its active supervision.   The undersigned is mindful that
9    Plaintiff is representing himself and that *pro se* litigants often
10   require extra attention and time.   This is not a problem, and the
11   undersigned welcomes the opportunity to assist *pro se* litigants to
12   the extent that fairness, neutrality, and impartiality allow.
13   However, Plaintiff has taken advantage of the Court's resources,
14   willingness to allow him leeway, and repeatedly has broken his
15   promises to conduct himself in a civil and courteous manner in his
16   dealing with the Court and counsel.   His behavior has resulted in
17   several unnecessary court appearances and the issuance of orders, as
18   well as this extensive Report and Recommendation, that ordinarily do
19   not issue, even in other *pro se* cases.   In the future, such a high
20   level of supervision will necessarily consume judicial resources
21   that could be devoted to other matters.

22        **3.    Prejudice to Other Parties From the Discovery Violations**

23        "A defendant suffers prejudice if the plaintiff's actions
24   impair the defendant's ability to go to trial or threaten to
25   interfere with the rightful decision of the case." Adriana Int'l
26   Corp. v. Lewis & Co., 913 F.2d 1406, 1412 (9th Cir. 1990); see also
27   Henry v. Gill Indus., Inc., 983 F.2d 943, 948 (9th Cir. 1993).   The
28

1    foregoing quote succinctly and accurately reflects the prejudice
2    Heritage has suffered and will continue to suffer.

3         Plaintiff's home address is material to Heritage's defenses
4    because it allows Heritage to explore an avenue of defense strategy
5    available to them.  Parties routinely provide this information to
6    litigation opponents in response to the routine interrogatory
7    Heritage propounded.  Plaintiff's belief to the contrary notwith-
8    standing, the request for his address is not extraordinary.
9    Heritage's inability to pursue this avenue of investigation results
10   in its lessened ability to mount a complete defense, a result that
11   will prejudice the company.  This is especially true here, where
12   Plaintiff's complaints of persisting eye injuries, which bear
13   directly on his damages claim, are apparently medically unsupported
14   and unexplained.

15        Plaintiff's overall conduct in this case also plays a role in
16   the undersigned's analysis.  Plaintiff has conducted himself
17   throughout this litigation in an aggressive, defiant manner that has
18   led to unnecessary delay of the litigation process and difficulty
19   for Heritage.  He has cooperated only when he felt like doing so and
20   defied a court order because he disagrees with it.  The net result
21   of his conduct is delay of the case and subversion of the truth-
22   finding process, which will ultimately result in Heritage's
23   inability to completely defend itself at trial.  Discovery is a
24   crucial part of litigation and allows each party the opportunity to
25   obtain information and evidence to prove its case or defend itself.
26   But when one party obstructs the process to such a degree that
27   another party cannot engage in discovery, the prevented party
28   ultimately cannot fully defend itself.

In addition to Plaintiff's conduct throughout this case, the undersigned is also very troubled by Plaintiff's deceptive actions at his deposition in particular. Plaintiff both lied and prevented Heritage from taking his deposition. If Heritage cannot depose Plaintiff, it cannot pursue a critical litigation tool and cannot muster evidence in its own defense as a result. Heritage's inability to do so not only prejudices the company, it does so in a severe manner. More significantly, however, Plaintiff's very act of lying casts a pall of doubt over everything Plaintiff says and does in the future and "threaten[s] to interfere with the rightful decision of the case." To compound his lie at deposition, Plaintiff is also willing to lie to the Court. The litigation process is one of truthfinding. When one party takes it upon himself to subvert the truth, the outcome of the case is tainted by doubt and fairness suffers.

Finally, it is abundantly clear that the Court's orders have little to no impact on Plaintiff's behavior, and he will continue his behavior into the future. Plaintiff has unnecessarily made the discovery process excruciatingly difficult, if not impossible. Even if Plaintiff sits for deposition, the Court is certain that he will make every effort to disrupt the deposition, avoid answering questions, respond with extreme aggression or argument, and to generally disrupt Heritage's pursuit of any information that could even remotely help in its defense.[10]   This strategy has been Plaintiff's *modus operandi* throughout this case, as evidenced by his correspondences, discovery responses, and other conduct, and there

---

[10]/   Although the Court could order Plaintiff's deposition, Plaintiff's demonstrated ability and willingness to lie and obstruct the process casts doubt over any testimony he may provide.

1   is absolutely no reason to believe he can constructively participate

2   in the future.[11/]   Moreover, Plaintiff will lie if he believes doing

3   so would benefit him.

4        The Third Circuit Court of Appeals long ago saliently

5   explained the rationale for imposing terminating sanctions for a

6   plaintiff's obstructive behavior during discovery.  The Court wrote:

7            Appellants advance the argument that it was error for
             the trial court to penalize them with . . . dismissal
8            without first ordering them to appear for their
             scheduled depositions.  Rule 37 sanctions are contem-
9            plated when there has been virtually total noncompli-
             ance with discovery.  Yet, a direct order by the
10           Court . . . is not a necessary predicate to imposing
             penalties under Rule 37(d).  When it has been deter-
11           mined that a party has wilfully failed to comply with
             the rules of discovery, it is within the discretion
12           of the trial court to dismiss the action.  Litigants
             may oppose discovery requests by seeking a protective
13           order from the court; they cannot be permitted to
             frustrate discovery by refusing to comply with a
14           proper request.  For courts to permit litigants to
             disregard the responsibilities that attend the
15           conduct of litigation would be tantamount to "encour-
             aging dilatory tactics."  The dismissal sanction,
16           although severe, is a necessary tool, both to punish
             in the individual action and to deter future abuses
17           of the discovery process.

18   Al Barnett & Son, Inc. v. Outboard Marine Corp., 611 F.2d 32, 35-36

19   (3d Cir. 1979) (citations omitted).  Without opposing discovery in

20   Court, Plaintiff has taken it upon himself to dictate how discovery

21   shall proceed, which interrogatories he wishes to answer and to what

22   extent he wishes to answer them, and how and when deposition shall

23   proceed--or not.  Plaintiff operates by his own rules, and the rules

24   by which Heritage is bound seem to matter little to him.

25        Not only has Heritage suffered serious prejudice to date, it

26   will continue to suffer severe prejudice into the future.   Such

27

28

---

11/ The root cause of this inability is, as the undersigned told Plaintiff at the October
2010 ENE, his intense emotions and detestation for Defendants and their counsel.

1  prejudice will increase by leaps and bounds as the time for trial

2  nears and Heritage has not been able to garner information in its

3  defense.

4      **4.   Public Policy Favoring Disposition on The Merits**

5      Although this factor ordinarily cuts against imposing case-

6  dispositive sanctions, the undersigned does not believe that this

7  important public policy would be fulfilled if Plaintiff's cases are

8  allowed to continue.   Plaintiff's obstructive conduct will very

9  likely mean that a true adjudication on the merits may never be

10  achievable in the end.

11      **5.   Whether Less Drastic Sanctions Are Available**

12      On March 25, 2011, the undersigned expressly notified

13  Plaintiff that case-dispositive sanctions could issue.  (Doc. No.

14  75.)  Plaintiff then proceeded to violate a court order, lie, and

15  evade deposition.  The undersigned is certain that any sanction

16  short of termination of these cases will ultimately fail to reign in

17  Plaintiff's conduct or compel him to conform his behavior.  This

18  assessment is based on the undersigned's observation of Plaintiff;

19  multiple unheeded warnings, both informally on the telephone and in

20  person and formally on the record and in written orders; his

21  continued failure to abide by the Court's orders; and his active

22  obstruction of the litigation process.  Stern warnings have not

23  worked, the possibility of lesser sanctions have not worked, and

24  monetary sanctions will be empty and ineffective because Plaintiff

25  has qualified to proceed *in forma pauperis* and does not have any

26  assets.  (See Doc. Nos. 2, 3 (IFP motion and order granting

27  motion).)

28

1   Moreover, issue and claim preclusion sanctions will also be

2   ineffective. Heritage will continue to suffer severe prejudice

3   short of precluding Plaintiff from presenting evidence in support of

4   all of the issues and claims in this case. This is because

5   Plaintiff has demonstrated a wholesale and routine propensity to

6   prevent Heritage from gathering evidence in general in its own

7   defense. This is not a case where a party violated one isolated

8   discovery order or refuses to produce just one document, the

9   punishment for which could be to preclude evidence on a discrete

10  issue or claim. When a party demonstrates a systematic practice of

11  obstructing an opposing party's discovery efforts, selective issue

12  and claim preclusion will not ameliorate the overall prejudice the

13  aggrieved party suffers. Plaintiff's continued obstructive conduct

14  will necessarily lead to the preclusion of a growing list of issues.

15  Based on experience and observation, the undersigned can come

16  to no other conclusion other than the futility of lesser sanctions

17  and that the only effective or practical solution here is dismissal.

18  **C.**    **This Case Compared to Other Cases**

19  Although termination of a plaintiff's case pursuant to Rule

20  37 is one of the most severe of sanctions, courts have imposed this

21  sanction where appropriate. In the context of depositions, most

22  cases impose this sanction for missing or avoiding several deposi-

23  tions. What sets the instant cases apart from the ones below is

24  Plaintiff's active deceit to thwart deposition, as opposed to

25  passive avoidance.

26  In Pioche Mines Consol., Inc. v. Dolman, 333 F.2d 257 (9th

27  Cir. 1964), the Ninth Circuit upheld the district court's entry of

28

default against an individually-named defendant after he failed to appear for several depositions and his counsel informed the court that he would not appear for deposition due to poor health. <u>Dolman</u>, 333 F.3d at 266-70. Although there was "doubt as to whether claimed disability was genuine," <u>id.</u> at 266, the district court's entry of default was not a result of any active deception, but was based, *inter alia*, on the defendant's passive acts of not appearing for multiple depositions and indicating that he would submit to deposition on his own terms. <u>See id.</u> at 267-69.

In <u>Hall v. Johnston</u>, 758 F.2d 421 (9th Cir. 1985), the Ninth Circuit affirmed entry of default against a defendant who failed to appear at two noticed depositions without any justification. The sanctioned party had two opportunities to appear for two noticed depositions, but failed to appear at both without justification. <u>Id.</u> at 422. The sole basis for entry of default against the sanctioned party was his failure to appear at two depositions. <u>See id.</u> at 424-25. The Ninth Circuit affirmed the trial court's entry of default. <u>Id.</u> at 425. Significantly, beyond missing two depositions, there is no indication in <u>Hall</u> that the sanctioned party had acted improperly or in bad faith at any other time during the life of the case.

More recently, the Ninth Circuit affirmed, although by unpublished memorandum disposition, a district court's dismissal based on "failure to prosecute where [the plaintiff] failed to respond to discovery requests, attend her deposition, produce initial disclosures, submit a Pretrial Order, attend the final Pretrial Conference, or file an opposition to defendant's Motion for Terminating Sanctions." <u>Drumgoole v. Am. Airlines, Inc.</u>, 316 Fed.

1   Appx. 606, 607 (9th Cir. 2009).  All of the above conduct involved
2   passive behavior such as failing to attend deposition.

3        Finally, the Seventh Circuit also recently affirmed dismissal
4   of a _pro se_ plaintiff's case for his "refusal to sit for a deposi-
5   tion and otherwise comply with discovery," which included failing to
6   produce documents.  Oliva v. Trans Union, LLC, 123 Fed. Appx. 725,
7   727 (7th Cir. 2005).  Again, this case involved a passive failure to
8   attend deposition or produce documents, rather than overt deceptive
9   conduct.

10       In contrast to the cases above, Heritage's motion is based
11  on, _inter alia_, conduct at only one deposition rather than at
12  multiple depositions.  However, the nature of Plaintiff's conduct is
13  significantly more reprehensible, as he took the affirmative, active
14  step of lying in order to avoid deposition.  The act of actively
15  lying is markedly more sinister than passive avoidance by failing to
16  appear.  Even one demonstrated incident of lying establishes the
17  capacity and willingness to obstruct the truth finding process,
18  flouts the integrity of the process, and casts heavy doubt on its
19  fairness.  See Anheuser-Busch, Inc. v. Natural Beverage Distribs.,
20  69 F.3d 337, 348-49 (9th Cir. 1995) (discussing deceit in the
21  context of the Court's inherent authority to impose sanctions, not
22  under Rule 37; "It is well settled that dismissal is warranted
23  where, as here, a party has engaged deliberately in deceptive
24  practices that undermine the integrity of judicial proceedings:
25  'courts have inherent power to dismiss an action when a party has
26  willfully deceived the court and engaged in conduct utterly
27  inconsistent with the orderly administration of justice.'")
28  (citation omitted).  Plaintiff also lied to the Court at an on-

1    record hearing.  The Court should not have to wait for more lies to

2    surface before being able to act.  Simply put, Plaintiff's conduct

3    in this case has been utterly inconsistent with the orderly

4    administration of justice, and this case is in line with the

5    aforementioned cases that have affirmed the imposition of terminat-

6    ing sanctions.

7    **D.**      **Heritage Should Bear Its Own Costs**

8         Heritage seeks $2,467.50 in costs incurred from the failed

9    deposition.  However, based on the balance of equities, the

10   undersigned recommends that costs not be awarded to Heritage.

11        The Federal Rules of Civil Procedure require that the Court

12   award Defendants "reasonable expenses, including attorney's fees"

13   "[i]nstead of or in addition to" terminating sanctions.  Fed. R.

14   Civ. P. 37(b)(2)(C).  The award of expenses under this rule are

15   mandatory unless Plaintiff can show that his conduct was "substan-

16   tially justified" or if "other circumstances make an award of

17   expenses unjust."  Id.  Based on the discussion above, Plaintiff

18   cannot show that his conduct was justified in any way, much less

19   substantially so.  However, as explained below, other circumstances

20   render the award of costs unjust.

21        The practical reality here is that Plaintiff is proceeding in

22   forma pauperis and has no assets against which Heritage could

23   collect a costs award.  (See Doc. Nos. 2, 3 (IFP motion and order

24   granting motion).)  Further, given Plaintiff's financial state, any

25   award against him would likely impose an unjust burden.  The

26   undersigned is aware that Plaintiff may have to travel to the East

27   Coast for family reasons, and any award against him may prevent him

28   from doing so.  On the other hand, Heritage, a business entity, can

1   much more readily absorb its costs.  To be sure, the undersigned

2   does not wish to trivialize the fact that Heritage incurred costs as

3   a direct result of Plaintiff's egregious conduct, but the balance of

4   equities nonetheless favors Heritage bearing its own costs here.

**V.   Conclusion**

6        Based on the foregoing, the undersigned RECOMMENDS that

7   Heritage's motion be GRANTED IN PART and Plaintiff's claims in all

8   three cases against Heritage be dismissed.  The undersigned further

9   RECOMMENDS that Heritage's motion be DENIED IN PART and costs not be

10  awarded to Heritage.

11       This report and recommendation of the undersigned Magistrate

12  Judge is submitted to the United States District Judge assigned to

13  this case, pursuant to the provisions of 28 U.S.C. Section

14  636(b)(1).

15       IT IS ORDERED that **no later than August 8, 2011**, any party to

16  this action may file written objections with the Court and serve a

17  copy on all parties.  28 U.S.C. § 636(b)(1).  The document should be

18  captioned "Objections to Report and Recommendation."  The parties

19  are advised that failure to file objections within the specified

20  time may waive the right to raise those objections on appeal of the

21  Court's order.  Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir.

22  1991).

23  DATED:  July 7, 2011

24

25  _____

26                                 Hon. William V. Gallo
                                   U.S. Magistrate Judge

27

28